UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

GWYNNELL D. CHAMBERS,        )
        )
    Plaintiff,        )
        )
    v.        )    CAUSE NO. 1:10-CV-01239-TWP-MJD
        )
MICHAEL J. ASTRUE,        )
Commissioner of Social        )
Security Administration,        )
        )
    Defendant.        )

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Gwynnell D. Chambers ("Mrs. Chambers"), requests judicial review of the decision of Defendant, Michael J. Astrue, Commissioner of Social Security Administration ("the Commissioner"), denying Mrs. Chambers' application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, the Commissioner's decision is **REMANDED** for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

Mrs. Chambers filed an application for DIB on February 27, 2006, alleging she became disabled on February 14, 2006. Her application was denied initially and upon reconsideration. On May 20, 2009, Mrs. Chambers appeared with counsel and testified at a hearing before Administrative Law Judge ("ALJ") Reinhardt Korte. On June 11, 2009, the ALJ issued his decision finding that Mrs. Chambers was not disabled. On September 16, 2010, the Appeals Council denied review of the ALJ's decision. The ALJ's decision is therefore the final decision of the Commissioner for purposes of judicial review.

## B. HISTORY

Mrs. Chambers was born in 1954.  (R. at 887).  She was 52 years old on her alleged onset date of February 14, 2006.  (R. at 887).  She has a GED and worked as a laboratory assistant at Bloomington Hospital from February 1980 to February 2006.  Mrs. Chambers alleges disability due to fibromyalgia, migraine headaches, degenerative disc disease of the cervical spine, depression and anxiety.

### 1.   <u>Medical History of Treatment by Physicians Other Than the Primary Physician</u>

Mrs. Chambers was initially evaluated by rheumatologist Dr. William Rusche on October 14, 2003.  (R. at 380-81).  Mrs. Chambers reported lower extremity muscle pain not associated with exertion or activity.  (R. at 380).  Dr. Rusche diagnosed Mrs. Chambers with lower extremity myalgias, and noted she lacked the typical fibromyalgia tender points.  (R. at 381).

Mrs. Chambers was initially evaluated by neurologist Dr. Jamie Bales on March 26, 2004.  (R. at 102, 109, 475-79).  Mrs. Chambers reported pain, numbness, and cramps in her legs.  (R. at 475).  Dr. Bales concluded Mrs. Chambers had no abnormalities that suggested central or peripheral neurologic disease; there was no evidence she had myositis, myopathy, or root disease; and she likely had fibromyalgia.  (R. at 479).

On July 2 and September 24, 2004, Mrs. Chambers was again treated by Dr. Bales.  (R. at 471).  She reported no real changes in her symptoms, but that she was a little better than when she first saw Dr. Bales in March.  (R. at 471).  Mrs. Chambers described her pain as occurring five to six days a week.  (R. at 466).  Mrs. Chambers stated that she was sometimes unable to go into work.  (R. at 466).  She reported that one to two days per week she had to leave work early.  (R. at 466).  At both visits, Dr. Bales concluded a "possible diagnosis" of fibromyalgia.  (R. at 474).  On November 30, 2004, Mrs. Chambers was treated by Dr. Bales.  (R. at 461).  Mrs.

Chambers reported her pain "was about the same."  (R. at 461).  She reported having trouble thinking clearly and increased fatigue.  (R. at 461-65).  Dr. Bales maintained his "possible diagnosis" of fibromyalgia and referred her back to Dr. Rusche for a reevaluation of myalgia and fibromyalgia.  (R. at 464-65).

On December 15, 2004, Dr. Rusche examined Mrs. Chambers.  (R. at 384).  Mrs. Chambers reported lower extremity myalgias.  (R. at 384).  Dr. Rusche diagnosed Mrs. Chambers with fibromyalgia.  (R. at 384).  Dr. Rusche recommended Mrs. Chambers perform low impact exercises and aquatic exercises with physical therapy.  (R. at 384).

On January 21, 2005, Mrs. Chambers was treated by Dr. Bales.  (R. at 456-60).  Mrs. Chambers described three bad days for her legs in December.  (R. at 456).  She reported that she had been off work for approximately one month, and her legs were better, because she had not been standing all day at work.  (R. at 456).  She stated it was a good day for her, and she had no pain.  (R. at 460).  Dr. Bales changed his "possible diagnosis" of fibromyalgia to a firm diagnosis of fibromyalgia.  (R. at 459).

On March 10, 2005, Mrs. Chambers was treated by Dr. Bales.  (R. at 452-55).  Mrs. Chambers reported pain that caused her to leave work early two to three times per week.  (R. at 455).  She also reported bouts of pain that prevented her from working for several days.  (R. at 455).  Mrs. Chambers stated she was concerned about her job because of her absences.  (R. at 452).  Dr. Bales referred her back to Dr. Rusche.  (R. at 455).

On March 17, 2005, Dr. Rusche treated Mrs. Chambers.  (R. at 385).  Mrs. Chambers reported "persistent, generalized pain most prominent" in her lower extremities.  (R. at 385).  Mrs. Chambers stated she was unable to work the prior week due to the pain.  (R. at 385).  Dr. Rusche noted 18 tender points.  (R. at 385).  He modified her medication and recommended

3

aquatic therapy. (R. at 385). Mrs. Chambers attended six aquatic therapy sessions in April and May 2005. (R. at 245-63). At the end of the therapy, however, she reported no overall decrease in her pain. (R. at 259).

On May 17, 2005, Mrs. Chambers was treated by Dr. Rusche. (R. at 386). Mrs. Chambers reported nine days of pain earlier in the month, which caused her to miss four days of work. (R. at 386). Dr. Rusche modified her medication and recommended low impact exercises. (R. at 386).

On August 16, 2005, Mrs. Chambers was treated by Dr. Rusche. (R. at 387). Mrs. Chambers complained of generalized pain and daily migraines. (R. at 387). She reported missing four days of work the prior week due to the migraines. (R. at 387). Dr. Rusche noted 18 tender points. (R. at 387). Mrs. Chambers asked Dr. Rusche whether she was a candidate for disability benefits. (R. at 387). Dr. Rusche wrote in his records, "I . . . believe that . . . she has come to the point where she is no longer able to work, she should apply for Social Security Disability." (R. at 387).

On October 12, 2005, Mrs. Chambers was treated by Dr. Rusche. (R. at 388). Mrs. Chambers reported persistent, generalized pain that was most prominent in her left neck region and lower left extremity. (R. at 388). She stated she was missing one to two days of work per week due to the pain. (R. at 388). Dr. Rusche noted seven tender points. (R. at 388).

On October 31, 2005, Mrs. Chambers had a cervical MRI. (R. at 168). The MRI showed a "slight increase in size of a left paracentral disc and osteophyte complex at C5-6 now causing minimal deformity of the left ventral cord," a "mild disc bulging at the C4-5 and C6-7 levels without cord impingement," and "mild facet arthropathy at C5-6 without significant neural foraminal narrowing." (R. at 168).

4

On December 19, 2005, Mrs. Chambers was treated by Dr. Rusche.  (R. at 389).  Dr. Rusche reported 18 tender points.  (R. at 389).  In response to Mrs. Chambers' inquiry as to her ability to work, Dr. Rusche noted that "[b]ased on her poor response to medications, therapy, and exercise, I believe she is disabled."  (R. at 389).

On January 12, 2006, Mrs. Chambers went to the emergency room for "generalized aches."  (R. at 287).  Mrs. Chambers was diagnosed with a muscle strain.  (R. at 291).  She was discharged and instructed to follow up with Dr. Rusche and her primary physician, Dr. Winders.  (R. at 296).

On February 14, 2006, Mrs. Chambers stopped working.  (Pl.'s Br. 8).  On February 22 and May 25, 2006, Mrs. Chambers was treated by Dr. Rusche.  (R. at 389, 156).  Dr. Rusche noted 12 tender points at the February appointment and multiple tender points at the May appointment.  (R. at 390, 156).

On May 30, 2006, at the request of the Social Security Administration, Mrs. Chambers was examined by Dr. Doug Poplin.  (R. at 188).  Dr. Poplin diagnosed Mrs. Chambers with fibromyalgia, migraine headaches, mild mitral and aortic valve regurgitation, depression, irritable bowel syndrome, acid reflux, chronic neck pain, and low back pain.  (R. at 191).  On the same day, Dr. Bruce Whitley completed a Residual Functional Capacity Assessment for Mrs. Chambers in which he reported that she could perform medium level work.  (R. at 232-39).  His conclusions were based on the following: "52 y/o with ef 60% on stress test 11/05.  Clmt has mild decreased rom in the spine.  Clmt has normal muscle strength and gait.  12/05 exam with Dr. Calli states 'physical exam is entirely normal.'"  (R. at 233).  On August 17, 2006, Dr. J.V. Corcoran affirmed Dr. Whitley's assessment.  (R. at 186).

On September 25, 2006, Mrs. Chambers was treated by Dr. Rusche.  (R. at 155).  Dr. Rusche reported 16 tender points, left shoulder and upper extremity pain, and recent hospitalization for left upper extremity pain.  (R. at 155).  Dr. Rusche opined that "she remains permanently disabled."  (R. at 155).

On October 5, 2006, Mrs. Chambers had a second cervical MRI.  (R. at 161).  The results showed: "Disk osteophyte complex asymmetric towards the left at C5-6 causing mild ventral cord flattening and overall mild central stenosis with bilateral foraminal narrowing.  Based on the report, there may be increase in the degree of narrowing.  Otherwise, no interval change."  (R. at 162).

In 2007 and 2008, Mrs. Chambers was treated by Dr. Rusche multiple times.  (R. at 854-59).  Dr. Rusche identified a diagnosis of fibromyalgia in every report following an examination.  (R. at 854-59).

On April 14, 2008, Dr. Marilyn Johnson, an Indiana Disability Determination Bureau physician, completed a Residual Functional Capacity Assessment for Mrs. Chambers.  (R. at 120).  Dr. Johnson reported that Mrs. Chambers could occasionally lift or carry up to 20 pounds and frequently lift or carry up to ten pounds.  (R. at 121).  She concluded Mrs. Chambers could stand and/or walk for a total of six hours in an eight hour work day and sit for a total of six hours in an eight hour work day.  Dr. Johnson reported Mrs. Chambers had unlimited ability to push and/or pull hand and/or foot controls.  (R. at 121).  Dr. Johnson concluded Mrs. Chambers could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (R. at 122).  She noted no further limitations.  (R. at 123-24).  Dr. Johnson based her conclusions on the following: "she has had severe fibromyalgia for many years, has had some cardiac rhythm disturbances with non-serious

findings." (R. at 121).   Dr. Johnson noted that her conclusions were different from the conclusions of Dr. Rusche.  (R. at 126).

On December 4, 2008, Mrs. Chambers had a third cervical MRI.  (R. at 863).  The results showed: "Disc protrusion, C5-C6, left, with cord compression.  Foraminal compromise, C5-C6, right.  Spondylosis, C6-C7."  (R. at 864).  The record noted "[n]o significant interval change" from the MRI results on October 5, 2006.  (R. at 863).

**2.   Medical History of Treatment by Primary Physician Dr. Winders**

Mrs. Chambers became a patient of Dr. Jennifer Winders in 2003.  (R. at 102, 110). Between October 2004 and October 2008, Mrs. Chambers was treated by Dr. Winders 26 times. (Pl.'s Br. 13, R. at 174-84, 846-51, 861-62).  For the sake of economy, only a small number of the appointments have been described below.

On October 23, 2004, Mrs. Chambers was treated by Dr. Winders.  (R. at 171).  Mrs. Chambers complained of headaches and muscle pain in her shoulders.  (R. at 184).  Dr. Winders observed that Mrs. Chambers' neck and shoulders were tender.  (R. at 184).

On April 5 and April 7, 2005, Mrs. Chambers was treated by Dr. Winders for headaches. (R. at 182-83).  On June 24, 2005 she was treated by Dr. Winders for constant headaches and sharp pain in her neck and shoulders.  (R. at 181).  On June 30, 2005, Mrs. Chambers reported to Dr. Winders that her headaches had improved.  (R. at 180).  On November 22, 2005, Mrs. Chambers was treated by Dr. Winders for neck pain.  (R. at 176).

On February 1, 2006, Mrs. Chambers was treated by Dr. Winders for pain and numbness in her right arm.  (R. at 174).  Dr. Winders recommended physical therapy.  (R. at 174).  On March 23, 2006, Mrs. Chambers was treated by Dr. Winders.  (R. at 146).  Mrs. Chambers reported that occupational therapy on her right arm had not helped the problem.  (R. at 146).  She

reported that her occupational therapist suggested she see an orthopedic specialist.  (R. at 146).  Dr. Winders had no objection.  (R. at 146).  Mrs. Chambers attended occupational therapy from May through July 2006.  (R. at 750, 785).  The discharge papers reflect that Mrs. Chambers was "relieved that her arm [was] finally feeling better."  (R. at 748).  On May 1, 2006, Mrs. Chambers was treated by Dr. Winders for back pain.  (R. at 146).

On March 10, 2006, Dr. Winders authored a letter regarding her treatment of Mrs. Chambers.  (R. at 164).  Dr. Winders reported that Mrs. Chambers had "severe myalgias, migraines, paresthesias, as well as some occasional episodes of chest pain and syncope."  (R. at 164).  Dr. Winders stated Mrs. Chambers had "tried several medications and other forms of treatment with little success," and "[t]hese problems have been worsening for the past three years."  (R. at 164).  Dr. Winders concluded that "[b]ecause of the severity of her symptoms, she is unable to work.  I have recommended disability for Mrs. Chambers."  (R. at 164).

On October 2, 2006, Dr. Winders completed a Physical Capacities Evaluation on behalf of Mrs. Chambers.  (R. at 158).  This form was relied on by the ALJ in his decision to give Dr. Winder's opinion "no weight."  In the evaluation, Dr. Winders stated Mrs. Chambers could sit for four hours at one time and total during an eight hour work day.  (R. at 158).  She stated Mrs. Chambers could stand and walk for two hours at one time and total during an eight hour work day.  (R. at 158).  Dr. Winders reported Mrs. Chambers could frequently lift and carry up to five pounds, occasionally lift and carry 6-20 pounds, occasionally lift, but never carry, 21-25 pounds, and never lift or carry over 26 pounds.  (R. at 158).  She stated Mrs. Chambers could not use her hands for repetitive grasping, pushing, or pulling of arm controls or use her feet for repetitive movements in pushing and pulling of leg controls.  (R. at 159).  Dr. Winders reported Mrs. Chambers was occasionally able to bend, squat, crawl, climb, and reach.  (R. at 159).  Dr.

8

Winders found credible Mrs. Chambers' statement that she had to lie down three times each day for about one hour at a time. (R. at 159). She further confirmed that pain prevented Mrs. Chambers from being able to maintain concentration during an eight hour day. (R. at 160). In her comments, Dr. Winders noted Mrs. Chambers occasionally had severe muscle spasms that completely incapacitated her. (R. at 160).

## C. THE ADMINISTRATIVE HEARING

### 1. Mrs. Chambers' Testimony

The Administrative Hearing was held on May 20, 2009. (R. at 884). At the hearing, Mrs. Chambers testified Dr. Rusche is her rheumatologist and Dr. Winders is her primary physician. (R. at 893-94). Mrs. Chambers described her appointments with Dr. Winders as occurring "whenever" and not on a regular basis. (R. at 895). She described her visits with Dr. Rusche as occurring "every three months." (R. at 895).

Mrs. Chambers testified she has pain in her neck, shoulders, and lower back, and she suffers from headaches. (R. at 901). She described her neck pain as occurring six days a week. (R. at 901). She described her back pain as occurring some days and not others. (R. at 902). Mrs. Chambers confirmed that she was taking the twelve medications listed in Exhibit E, with the exception of an antacid which had been switched to a different brand. (R. at 890-93, 646). Mrs. Chambers testified that she does not abuse alcohol, take illegal drugs, or use tobacco. (R. at 898).

Mrs. Chambers testified she has "maybe two good days" in a typical week. (R. at 899) and on a good day she can sit for an hour and stand for twenty minutes. (R. at 895-96). Mrs. Chambers testified that she still spends part of a good day reclining. (R. at 900) and she takes one to two hour naps every day. (R. at 900). She testified that she has walked a mile on a good

day and then been unable to get up for two days.  (R. at 896).  Mrs. Chambers stated that she has

attempted Dr. Rusche's suggested walking and stretching exercises; however, her ability to

perform the exercises depends on "how much [she is] hurting that day."  (R. at 896).

The ALJ read excerpts from a questionnaire that Jerry Chambers ("Mr. Chambers"), Mrs.

Chambers' husband, had answered regarding her condition.  (R. at 897).  In the questionnaire,

Mr. Chambers described a typical day for Mrs. Chambers.  (R. at 897).  The ALJ read the

following excerpt:

> Has light meals for breakfast and lunch, reads the Bible, newspaper
> and religious publications.  Talks to friends and relatives on the
> phone.  Visits her mother to check on her condition.  Does light
> house work and short hitches.  Watches TV.  Listens to music.  Has
> conversations with me when she feels like it.

(R. at 897).  Mrs. Chambers testified that her husband's description of her typical day was

accurate.  (R. at 897).  The ALJ continued:

> 'She goes to the grocery about twice a week and cooks main dishes
> about once a week for evening meals.'  And then, under house and
> yard work, he said you're able to do light housework for short
> periods, dusting, cleaning laundry.  No strenuous outdoor work such
> as mowing and washing windows.

(R. at 897).  Mrs. Chambers testified that the description was accurate, depending on whether she

was "hurting that day."  (R. at 897).  Mrs. Chambers explained, "If I'm hurting, I don't do

anything.  If I don't, I do those things."  (R. at 897).  Mrs. Chambers testified that she does things

"in hitches," which she described as doing a physical task and then resting for a period of time.

(R. at 898).  Mrs. Chambers testified that she visits her mother, who lives six miles away, and the

two recline and talk.  (R. at 903).

Mrs. Chambers testified she has a GED and can read.  (R. at 902).  She stated that writing and math are not her strongest skill sets.  (R. at 902).  Mrs. Chambers testified if she had a job, there are days when she could not get out of bed to go to work.  (R. at 900).

## 2.  Medical Expert's Testimony

Two medical experts testified at the hearing, Dr. Jack Thomas, who is board certified in clinical psychology, and Dr. Lloyd Stump, who is board certified in internal medicine.  (R. at 885).  Because the ALJ gave great weight to the testimony of Dr. Stump, a summary of his testimony is included in this entry.  Dr. Thomas' testimony is not summarized in this entry.

Based on the charts of Mrs. Chambers' rheumatologist and neurologist, Dr. Stump ("ME") concluded Mrs. Chambers has fibromyalgia. (R. at 905).  The ME stated there was nothing objective in Mrs. Chambers' medical files regarding the fibromyalgia, "as you would expect."  (R. at 906).  Upon questioning by Mrs. Chambers' attorney, the ME confirmed there is not an objective test that shows the severity of fibromyalgia. (R. at 908).  The ME testified that he believes Mrs. Chambers' major symptoms are from the fibromyalgia and not the degenerative disc disease in the neck region. (R. at 906).  Upon questioning by Mrs. Chambers' attorney, ME confirmed that Mrs. Chambers' complaints of pain are consistent with fibromyalgia. (R. at 908).  The ME testified the need to lie down or recline throughout the day can be consistent with fibromyalgia and is not uncommon with fibromyalgia, but is not present in all fibromyalgia cases. (R. at 908).

The ME testified that based on her medical charts, and not her testimony, Mrs. Chambers should be able to perform light work.  (R. at 907).  The ME testified that Mrs. Chambers is limited to using ramps and stairs only occasionally, and she should never use ropes or scaffolds.  (R. at 907).  He stated Mrs. Chambers may balance and stoop.  (R. at 907).  The ME testified

Mrs. Chambers may kneel occasionally but should never crawl.  (R. at 907).  He stated she has

no limitations on manipulation, visual, or communications.  (R. at 907).  The ME further testified

that people with fibromyalgia should avoid moderate exposure to extreme heat, cold, wetness,

and humidity.  (R. at 908).  Finally, he stated noises are bearable, but she should avoid vibration.

(R. at 908).

### 3.  Vocational Expert's Testimony

The Vocational Expert ("VE"), Gail Corn, testified that Mrs. Chambers' former position

as a laboratory assistant is found at DOT 078.381-014.  (R. at 909).  VE described the job as "the

light level" with an SVP of five.  (R. at 909).  VE testified that given Mrs. Chambers' vocational

background and her limitations based on ME's testimony, she could perform her past relevant

work as a laboratory assistant as it was generally performed. (R. at 909).  Upon questioning by

Mrs. Chambers' attorney, VE testified if Mrs. Chambers' complaints are "fully credited," there is

not a job that she could perform on a full time basis, because of her difficulty in maintaining

attendance and "maintaining either postural activity."  (R. at 910).  VE stated a person holding a

job similar to a laboratory assistant position would typically not be permitted to miss more than

one day of work per month.  (R. at 910).  VE testified a person who cannot sit, stand, and walk

for eight hours cannot perform a job on a full time basis. (R. at 910).

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for SSI and DIB, a claimant must have a disability under 42 U.S.C. § 423.

"Disability" means the inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment that has lasted or can be expected to last

for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A).   In

determining whether a claimant is disabled, an ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1.      If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2.      If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3.      If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4.      If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5.      If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v.*

*Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

## III. <u>DISCUSSION</u>

### A. THE ALJ'S FINDINGS

As reported in his decision, the ALJ found that Mrs. Chambers met the disability insured status requirements of the Social Security Act through December 31, 2010, and that Mrs. Chambers had not engaged in substantial gainful activity since her alleged onset date of February 14, 2006. (R. at 18). The ALJ found that Mrs. Chambers had fibromyalgia, irritable bowel syndrome, migraines secondary to the fibromyalgia, and cervical degenerative disc disease. (R. at 18). The ALJ found these impairments were severe as defined under the Social Security Act and had caused more than a minimal effect on Mrs. Chambers' ability to perform substantial gainful activity. (R. at 21). The ALJ concluded, however, that Mrs. Chambers' impairments did not meet or medically equal Listings 1.02, 1.04, 14.06 or any other impairment found in the regulations' Listing of Impairments. (R. at 22). The ALJ found that Mrs. Chambers had the residual capacity to perform light work consistent with the following capabilities: lift or carry ten

pounds frequently; lift or carry twenty pounds occasionally; stand or walk, off and on, for six hours during an eight hour work day; intermittently sit for two hours during an eight hour day; do some pushing and pulling of arm and leg controls; use her hands and arms for grasping, holding, and turning objects; climb ramps and stairs occasionally; balance and stoop frequently; and kneel occasionally. (R. at 22).   In making the above determinations, the ALJ found Mrs. Chambers' statements regarding the intensity, persistence, and limiting effects of her symptoms were not credible and accorded them less weight than the medical evidence and opinions in the record. (R. at 24).  Based on Mrs. Chambers' Residual Functional Capacity Assessment, the ALJ concluded Mrs. Chambers was capable of performing her past relevant work as a laboratory assistant.  (R. at 25).

## B. MRS. CHAMBERS' ARGUMENTS ON APPEAL

Mrs. Chambers makes three arguments on appeal.  First, the ALJ erred by failing to analyze the requisite factors to determine the weight given to the opinion of Dr. Winders, a treating physician.  Second, the ALJ erred by failing to explain the amount of weight given to her husband's statements.   Third, the ALJ's decision was erroneous because he relied on an incomplete evaluation of her daily activities to determine the credibility of Mrs. Chambers' testimony.  The Court will address the three arguments in turn.

### 1.   20 C.F.R. 404.1527 Factors

To reiterate, the ALJ gave "no weight" to Dr. Winders' opinion.  Mrs. Chambers claims that even assuming *arguendo* that the ALJ was justified in reaching this conclusion, the ALJ was still required to subsequently analyze the factors found in 20 C.F.R. 404.1527.  The ALJ's failure to "show his work," so to speak, renders his ruling fatally defective.

Specifically, the ALJ's decision contains the following statement regarding the treating physician's opinion:

> I give *no weight* to the physical residual functional capacity report completed by the claimant's primary care physician, Jennifer Winders M.D.  Her opinion is not entitled to significant weight as she assessed the claimant's residual functional capacity renders her unable to sustain work activity in an ordinary work setting on a regular and continuing basis as she opines the claimant can only sit, stand, and walk in combination a total of six hours of an eight hour day because of occasional severe muscle spasms, which cause her to be completely incapacitated [].  Dr. Winders' opinion is not supported by the clinical evidence of record.

(R. at 24) (emphasis added).   Significantly, 20 C.F.R. § 404.1527(d) describes the Social Security Administration's evaluation process for medical opinion evidence. 20 C.F.R § 404.1527(d) (2011).   Under Section 404.1527(d)(2), a treating physician's medical opinion is given controlling weight if it is (1) "well supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent" with the other evidence in the record.  20 C.F.R. § 404.1527(d)(2).  The ALJ determined that Dr. Winders' opinion did not meet the second requirement; that is, Dr. Winders' opinion was entitled to "no weight" because it was inconsistent with the medical evidence of record.  (R. at 24).

However, because the ALJ did not give the treating physician's opinion controlling weight, he was required to subsequently analyze certain factors.  On this point, § 404.1527(d)(2) provides:

> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 404.1527(d)(2).  The factors referred to in the regulation include: (d)(2)(i) "[l]ength of the treatment relationship and the frequency of examination;" (d)(2)(ii) "[n]ature and extent of the treatment relationship;" (d)(3) "[s]upportability" with medical evidence; (d)(4) "[c]onsistency" with the record; (d)(5) "[s]pecialization" of the physician; and (d)(6) "[o]ther factors" of relevance.  20 C.F.R. § 404.1527(d).  A treating source's medical opinion that does not meet the requirements for controlling weight is "still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527."  SSR 96-2p, 61 Fed. Reg. 34490 (July 2, 1996).  If the ALJ's decision is not favorable to the claimant, as it was here, the ALJ's decision:

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, *and* must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p (emphasis added).  At bottom, this case must be remanded because ALJ failed to properly evaluate Dr. Winders' opinion by applying the required factors.

This position is reinforced by Seventh Circuit authority.   In *Larson v. Astrue*, 615 F.3d 744 (7th Cir. 2010), the ALJ gave the physician's opinion "some weight," but "said nothing regarding th[e] required checklist of factors." *Id*. at 751.  The ALJ in *Larson* failed to explain his reason for not giving the treating physician's opinion controlling weight.  *Id.*  The *Larson* court stated that even if the ALJ had met the requirement to articulate his reason for not giving the opinion controlling weight, "it still would have been necessary to determine what weight [the physician's] opinion was due under the applicable regulations."  *Id.* Consequently, the *Larson* court overturned the ALJ's decision, and through further analysis decided the physician's opinion deserved controlling weight. *Id.*  In sum, although the ALJ is only required to meet the

"lax" standard of "minimally articulat[ing] his reasons" for giving certain weight to a medical opinion, he must apply at least some of the factors described above. *Cf. Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008).

While it is clear the ALJ gave Dr. Winders' opinion no weight whatsoever, it is not clear why he decided to attribute this level of weight to the opinion. Like the ALJ in *Larson*, the ALJ here "said nothing regarding th[e] required checklist of factors." *Larson*, 515 F.3d at 751. The ALJ may have had legitimate reasons anchored in the required factors for giving the treating physician's opinion no weight; however, he must at least "minimally articulate" those reasons in his decision. The ALJ's analysis of the treating physician's opinion is therefore erroneous and, warrants remand.

### 2. "Other Sources" Weight

In her second argument, Mrs. Chambers claims the ALJ's explanation of the weight and credibility given to her husband's statements was insufficient to meet the requirements of SSR 06-3p and SSR 96-7p. The ALJ's decision contains the following statement, "I have also given some weight to the statements of the claimant's spouse, Jerry Chambers, regarding the limiting effects of the claimant's impairments upon her activities." (R. at 24). Under 20 C.F.R. § 404.1513(d), the spouse of the claimant falls within the "other sources" category of witnesses. 20 C.F.R. § 404.1513(d) (2011). The appropriate treatment of opinions and evidence from "other sources" is described in SSR 06-3p. SSR 06-3p, 71 Fed. Reg. 45593 (Aug. 9, 2006). SSR 96-7p, cited by Mrs. Chambers, explains the appropriate analysis for determining the claimant's credibility, but it does not apply to the credibility of "other sources." SSR 96-7p, 61 Fed. Reg. 34483 (July 2, 1996).

The ALJ must "consider all relevant evidence in the case record," and this includes opinion evidence from "other sources."  SSR 06-3p, 71 Fed. Reg. 45593 (Aug. 9, 2006). According to SSR 06-3p, the ALJ "*generally should* explain the weight given to opinions from these 'other sources.'"  SSR 06-3p, 71 Fed. Reg. 45593 (Aug. 9, 2006) (emphasis added).  The ruling does not, however, include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from "other sources."  SSR 06-3p, 71 Fed. Reg. 45593 (Aug. 9, 2006).

In *Giles v. Astrue*, cited by Mrs. Chambers, the Seventh Circuit held that the ALJ's lack of a credibility determination for the testimony of the claimant's mother was insufficient to meet the requirements of SSR 96-7p. 483 F.3d 483, 488-89 (7th Cir. 2007).  The claimant in *Giles*, however, was a child. *Id.* at 486.  Mr. Chambers' testimony and the ALJ's credibility finding are more closely aligned with the facts in *Carlson v. Shalala*, 999 F.2d 180 (7th Cir. 1993).  In *Carlson*, the claimant argued that the ALJ's decision was erroneous, because it failed to evaluate the testimony of the claimant's wife. *Id.* at 181.  The Seventh Circuit rejected this argument, because the wife' testimony was "essentially redundant." *Id.*  The wife's testimony "essentially corroborated [the claimant's] account of his pain and daily activities" and the ALJ had analyzed that line of evidence by considering the testimony of the claimant himself on those topics. *Id.*; *see also Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996).  During the hearing, the ALJ read excerpts from a questionnaire that Mr. Chambers had answered regarding Mrs. Chambers' daily activities.  (R. at 897).  Mrs. Chambers testified that her husband's descriptions were accurate. (R. at 897).  In this instance, Mr. Chambers' testimony was entirely redundant, because it was not essentially the same testimony, but it was the exact same testimony, confirmed by Mrs. Chambers at the hearing.  The ALJ, therefore, did not need to further evaluate Mr. Chambers'

testimony, because he had analyzed that line of evidence by considering the testimony of Mrs. Chambers.

**3**.        **Credibility of Mrs. Chambers**

Finally, Mrs. Chambers argues the ALJ's analysis of her credibility is erroneous, because it is based on an incomplete evaluation of her daily activities.  The ALJ's decision regarding a witness's credibility will not be overturned unless it is "patently wrong," because the ALJ "is in the best position to determine a witness's truthfulness and forthrightness." *Skarbeck v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).  However, as Mrs. Chambers emphasizes, "errors of fact or logic" will override this deference. *Allord v. Barnhart*, 455 F. 3d 818, 821 (7th Cir. 2006).

When evaluating a claimant's credibility, one of the factors the ALJ must review is the claimant's daily activities.   20 C.F.R. § 404.1529(c)(3)(i) (2011); SSR 96-7p, 61 Fed. Reg. 34483 (July 2, 1996).  Mrs. Chambers alleges the ALJ made two incorrect determinations: (1) that Mrs. Chambers had no significant limitations in meeting the demands of a physical examination in May 2006; and (2) that Mrs. Chambers' daily activities demonstrate at least a light level of function.  The ALJ's first conclusion, regarding the physical examination in May 2006, was taken directly from Dr. Doug Poplin's notes regarding the examination.  (R. at 190). This conclusion is therefore not an error of fact of logic, but simply a statement from the record. The ALJ's second determination, regarding Mrs. Chambers' ability to function at a light level, was based on the fact that Mrs. Chambers attends to her personal hygiene, prepares meals, performs light house work, socializes with family and friends, goes to church and shopping, and visits her mother.  (R. at 24).  Mrs. Chambers claims the ALJ failed to take into consideration her limitations in this analysis; however, the ALJ stated "[t]here can be no doubt that the claimant

20

may experience symptoms associated with her impairments, but her daily activities reveal a significant level of function notwithstanding her alleged symptoms."  (R. at 24).  The ALJ concluded that while Mrs. Chambers may be impaired, she is not disabled.  (R. at 24).  Contrary to Mrs. Chambers' allegations, these statements reflect that the ALJ considered Mrs. Chambers' limitations in making his determination.  The ALJ's conclusion as to Mrs. Chambers' level of functioning was not based on an error of fact or logic, is not "patently wrong," and therefore must be upheld.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the decision of the Commissioner of Social Security in this case is **REMANDED** for further proceedings consistent with this opinion.

IT IS SO ORDERED this day:  12/13/2011

_____

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Timothy J. Vrana
tim@timvrana.com